IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION

| | | |
|---|---|---|
| ELZIE WOODS AND FELECIA PATTERSON, INDIVIDUALLY, | * | |
| | * | |
| | * | |
| Plaintiffs, | * | |
| vs. | * | No. 5:06cv00247 SWW |
| | * | |
| | * | |
| ARKANSAS DEPARTMENT OF CORRECTION, DIRECTOR LARRY NORRIS IN HIS OFFICIAL AND INDIVIDUAL CAPACITY, WARDEN GAYLON LAY IN HIS OFFICIAL AND INDIVIDUAL CAPACITY and BOARD OF DIRECTORS MEMBERS DR. MARY PARKER, BENNY MAGNESS, LEROY BROWNLEE, DREW BAKER, BILL FERREN, ALONZA JILES AND KELLY PACE IN THEIR OFFICIAL AND INDIVIDUAL CAPACITIES, | * | |
| | * | |
| | * | |
| | * | |
| | * | |
| | * | |
| | * | |
| | * | |
| | * | |
| | * | |
| | * | |
| | * | |
| | * | |
| Defendants. | * | |

MEMORANDUM AND ORDER

Plaintiff Elzie Woods ("Woods"), an African-American male, and plaintiff Felecia

Patterson ("Patterson"), an African-American female (collectively "plaintiffs"), bring this action

pursuant to 42 U.S.C. §§ 1981, 1983, and Title VII of the Civil Rights Act of 1964 ("Title VII"),

42 U.S.C. §§ 2000e *et seq.*, following the termination of their employment from the Arkansas

Department of Correction ("ADC"). The matter is before the Court on motion of defendants, the

ADC, Director Larry Norris ("Norris") in his official and individual capacity, Warden Gaylon

Lay ("Lay") in his official and individual capacity, and Board of Directors Members Dr. Mary

Parker, Benny Magness, Leroy Brownlee, Drew Baker, Bill Ferren, Alonza Jiles, and Kelly Pace

in their official and individual capacities, for summary judgment [doc.#49]. Plaintiffs have

responded in opposition to defendants' motion, defendants have filed a reply to plaintiffs'
response, and plaintiffs have filed a sur-reply to defendants' reply.  Having considered the
matter, the Court grants defendants' motion for summary judgment as to plaintiffs' federal
claims.


I.

The ADC is an agency of the State of Arkansas.  Norris is, and was at all times relevant
to this case, the director of the ADC, and Lay has served as warden of the Cummins Unit of the
ADC since June 2003.  At the time this action was filed, Dr. Mary Parker, Benny Magness,
Leroy Brownlee, Drew Baker, Bill Ferren, Alonza Jiles and Kelly Pace constituted the members
of the Arkansas Board of Corrections, which has general supervisory power and control over the
ADC.


ELZIE WOODS

Woods was hired by the ADC in 1984 and subsequently was promoted to Food
Production Manager 1.  At the time of his termination, Woods was a kitchen supervisor at the
Cummins Unit of the ADC.  His duties included meal preparation, supervision of inmates
involved in meal preparation, and security.  Typically the Cummins kitchen is staffed with a
kitchen supervisor, an assistant, and one security officer, together with as many as 40-50 inmate
workers.  At times, more security personnel may be present and fewer inmates in the area.

On March 13, 2005, Correctional Officer Rosalind Davies ("Davies"), who was then
assigned to the Cummins kitchen and was a friend of Woods, met with Assistant Warden Kim

Luckett ("Luckett") and related to Luckett that she was told that Captain Robert Long ("Long"), who was charged with responsibility for kitchen operations, had made disrespectful comments about her. Luckett encouraged Davies to put the matter in writing. On March 25, 2005, Davies filed a grievance complaining that she was qualified for but not promoted to the position of Food Production Manager I, and that she had been subjected to sexual harassment. Davies asked that Long be removed from the kitchen. Lay referred Davies' allegations to the ADC's Internal Affairs Division ("IAD") for investigation. On April 22, 2005, Davies was promoted to Food Production Manager I, the position to which she had requested promotion.

On April 27, 2005, Woods was interviewed by IAD investigator Margaret Rogers concerning Davies' allegations against Long. Woods stated in his interview that Long often spoke of homosexuals in the kitchen, had called female employees derogatory names, and spoke of female officers' alleged sexual relations with others.

On May 5, 2005, Davies and Long were each administered a Computerized Voice Stress Analysis ("CVSA") test – a type of polygraph – by IAD investigator Ruth Clark ("Clark"). Davies was found to be "not deceptive" when asked about sexual comments made by Long concerning a relationship between Woods and Davies, and Long was found to be "deceptive" concerning the same question. On May 20, 2005, Lay received the IAD report. Lay found Long guilty of conduct unbecoming an employee while on duty and issued a written warning and six months probation.

On October 24, 2005, ADC correctional officers conducted a routine "shakedown" of Cummins inmate Brian Morris' ("Morris") cell and discovered 15 packs of marijuana, totaling 3.2 ounces. Morris was one of the inmates assigned to work in the Cummins kitchen and chow

hall.  While later being questioned by Lay, Morris stated that he had bought the marijuana from

Woods.  Lay thereupon referred the matter to IAD for investigation.  IAD interviewed Morris,

who told essentially the same story as that told to Lay.

On November 2, 2005, a CVSA test was administered to Morris by IAD investigator

Cindy Courington ("Courington").  Morris responded "yes" to the following questions: (a) Did

you leave green money for Mr. Woods in the dishwasher at Cummins, and (b) Did Mr. Woods

leave you marijuana in the dishwasher at Cummins?  Courington interpreted the test results to

indicate "no deception."  A "cold call," *i.e.*, a review of the results by another examiner who was

not told the name of the subject, concurred.

On January 4, 2006, IAD investigator Raymond Naylor ("Naylor") reported to Norris

that Morris' CVSA test had indicated he was not deceptive in his accusations against Woods,

and requested permission to administer a CVSA test to Woods.  Norris granted Naylor's request

and on January 4, 2006, Courington administered a CVSA test to Woods.  Woods responded

"no" to the following questions: (a) Did inmate Morris leave green money for you in the

dishwasher at Cummins, and (b) Did you leave marijuana in the dishwasher at Cummins?

Courington interpreted the test results to indicate deception on both questions.  A "cold call" by

Clark concurred.

On January 10, 2006, Woods observed inmate Gregory McElroy ("McElroy") and

another inmate conversing in the chow hall.  Woods observed McElroy place something in his

pocket and ordered both inmates to be searched.  Both inmates were cuffed by ADC correctional

officers and, following a search, a home made knife or "shank" was found in McElroy's pocket.

McElroy was charged with, and found guilty of, possession of a weapon and sentenced to 30

days punitive isolation and reduced in class.

On January 17, 2006, McElroy alleged in an interview by Naylor that he owed Woods $100 for tobacco Woods had "fronted him." McElroy also alleged that inmate Charles Smith had gotten tobacco and marijuana from Woods. McElroy claimed he had simply found the shank on the kitchen floor. A CVSA test was administered to McElroy that same day in which McElroy responded "yes" to the following questions: (a) Did Woods confront you regarding the $100 for tobacco, and (b) Did you find a shank on the kitchen floor? Courington interpreted the test results to indicate no deception with respect to money owed to Woods, and deception with respect to the shank found on McElroy. A "cold call" by Clark concurred.

On January 18, 2006, IAD delivered to Lay's office the report of its investigation of Woods. The following day, Assistant Warden William Straughn, Assistant Warden Danny Burl and Lieutenant Bruce Green met with Woods in Lay's office. The evidence against Woods was discussed with him and Woods was given an opportunity to provide an explanation of the charges against him.

On January 19, 2006, Lay terminated Woods' employment, effective immediately, finding Woods guilty of possession, use, sale or distribution of illicit drugs or paraphernalia, falsification of written/verbal statements/information and trafficking and/or unauthorized trading, all violations of ADC employee conduct standards. Woods subsequently filed a grievance, asserting that the CVSA test was inaccurate, and seeking reinstatement. Woods' grievance did not request a polygraph or another CVSA test.

On February 2, 2006, Norris elected to have Woods' grievance reviewed by the Internal Review Committee. The Committee met on February 15, 2006, and Woods was given and took

the opportunity to present his story.  Woods did not assert that he had been threatened or bullied, or that he was nervous when he took the CVSA test.  Nor did Woods at that time claim that the termination of his employment was motivated by race.  The Committee unanimously voted to recommend that Lay's decision be affirmed and forwarded its recommendation to Norris.

On February 27, 2006, Norris upheld Lay's decision to terminate Woods.  Woods appealed his termination to the State Employee Grievance Appeal Panel ("SEGAP") and, unlike his February 15th testimony before the Internal Review Committee, claimed that he was threatened by Naylor.  On June 14, 2006, a SEGAP panel met and took testimony from Lay, Courington, Naylor, and Woods.  For the first time, Woods alleged he was a victim of race based discrimination.  On June 27, 2006, the SEGAP panel issued its decision finding that Woods had failed to prove that his termination was racially motivated or in retaliation for statements he made relative to the grievance of Davies against Long.


FELECIA PATTERSON

Patterson was hired by the ADC as a correctional officer in 1995 and was subsequently promoted to the rank of sergeant.  In December 2005, Patterson was assigned to one of the night shifts at Cummins.  Patterson was responsible for supervising other officers in the "South Hall," a collection of barracks located in a building separate from the Cummins main building.

On January 13, 2006, inmate Michael Gardner ("Gardner"), who resided in South Hall at Cummins, informed Building Security Major V.R. Robertson ("Robertson") that Correctional Officer Kim Massey ("Massey") was having sex with inmate Charles Creal ("Creal"), and giving

money, food, and tobacco to Creal.[1]  Gardner also claimed to have seen Patterson and inmate Jeremy Davis ("Davis") engaged in a sexual act.  Robertson instructed Gardner to put his allegations in writing.

On January 16, 2006, Gardner provided a written statement to Robertson in which Gardner alleged that he served as a "lookout" while Massey and Creal had sex in a supply closet and that he observed Patterson having sex with Davis.  In his written statement, Gardner also claimed that Officer "Harris" was "going with" another inmate, that Officer "Hopkins" was "fooling around with" another inmate, and that a "white woman officer" ... "fooled around" with another inmate.  It has since been determined that "Hopkins" and "Harris" were African-American females.

On January 18, 2006, Lay referred all of Gardner's allegations to IAD for investigation.  Two days later, a CVSA test was administered to Gardner by Courington.  Among other questions, Gardner was asked whether he observed Patterson and Davis having sex.  Gardner answered "yes."  Courington interpreted the test results to indicate no deception by Gardner.  A "cold call" by Clark concurred.

On January 31, 2006, Courington administered a CVSA test to Davis.  During the test, Davis responded "no" to the following questions: (a) "Have you ever touched Patterson inappropriately" and (b)"Have you ever had sex with Patterson."  Courington interpreted the test results to indicate deception on both questions.  A "cold call" by Clark concurred.

On February 14, 2006, Patterson was interviewed by IAD investigator Ronnie Vilches ("Vilches").  Patterson was asked to take a CVSA test and she did so voluntarily that same day.

---

[1] On January 10, 2006, Creal was found in possession of $130.00 and a pack of tobacco, both considered contraband.

During the test, which was administered by Courington, Patterson responded "no" the following questions: (a) have you had sexual physical contact with inmate Davis, and (b) have you had sexual intercourse with inmate Davis?  Courington interpreted the test results to indicate deception on the first question, but showing little to no deception on the second question.  A "cold call" by Clark concurred.

Following her CVSA test, Patterson was questioned by Vilches about any circumstances that Patterson knew of which might lead to a showing of deception on the CVSA.  Patterson denied that she had ever had contact with an inmate in the course of a search that could be considered "sexual physical contact."  Patterson related to Vilches that she believed an inmate, whose last name was "Brooks," might have accused her of inappropriate touching during a search.  Patterson could not remember the year, the place of the event, or the inmate's first name.

On March 15, 2006, the final IAD report concerning the allegations against Patterson was received in Lay's office.  Two days later, Lay met with Patterson in his office.  Also present were Assistant Warden Danny Burl and Human Resources Officer Diane Lenderman.  At that time, Lay presented the allegations and findings to Patterson.  Patterson explained to Lay that she was nervous when she took the CVSA and that Courington had been disrespectful by asking her about sex with an inmate.  Lay nevertheless terminated Patterson on March 17, 2006, for engaging in sexual contact with an inmate, development of non-professional relationships with inmates, and falsification of statements.

Patterson appealed Lay's decision to terminate her.  A grievance hearing was held on May 9, 2006, and the grievance committee voted to uphold Lay's decision to terminate Patterson.  On May 30, 2006, Ray Hobbs, acting as Interim Director, reviewed the grievance

committee's recommendation and confirmed Lay's decision to terminate Patterson.

Patterson appealed her termination to the SEGAP.  The SEGAP found that the ADC's policy concerning the use of CVSA test evidence required independent corroborating evidence, and held that the ADC had not presented independent corroborating evidence consistent with the ADC's policy.  The decision to terminate Patterson was overturned by the SEGAP.  The ADC appealed the SEGAP's decision to the State's Chief Fiscal Officer who, on January 10, 2007, confirmed the SEGAP's decision to reinstate Patterson.  Patterson returned to work with the ADC immediately after the SEGAP's decision was affirmed

II.

Defendants move for summary judgment on grounds, among other things, that neither plaintiff has produced any direct or indirect evidence that race, gender, or protected activity were factors in the decision to terminate them, there were legitimate, non-discriminatory reasons for their termination, and there is no evidence that other similarly situated employees were disciplined with less than termination in similar circumstances.  Defendants argue there are no genuine issues of material fact with respect to these issues and that they are entitled to summary judgment as a matter of law.

A.

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." Fed.R.Civ.P. 56(c).  As a prerequisite to summary judgment, a moving party

must demonstrate "an absence of evidence to support the non-moving party's case." *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Once the moving party has properly supported its

motion for summary judgment, the nonmoving party must "do more than simply show there is

some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*,

475 U.S. 574, 586 (1986).  The nonmoving party may not rest on mere allegations or denials of

his pleading, but must "come forward with 'specific facts showing that there is a *genuine issue*

*for trial*.'" *Id*. at 587 (quoting Fed.R.Civ.P. 56(e) and adding emphasis).  *See also Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  The inferences to be drawn from the underlying

facts must be viewed in the light most favorable to the party opposing the motion.  *Matsushita,*

475 U.S. at 587 (citations omitted).  However, "[w]here the record taken as a whole could not

lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"

*Id*. (citation omitted).  "Only disputes over facts that might affect the outcome of the suit under

the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S.

at 248.  "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*


## B.

### 1.

As a preliminary matter, the Court grants summary judgment to Board of Directors

Members Dr. Mary Parker, Benny Magness, Leroy Brownlee, Drew Baker, Bill Ferren, Alonza

Jiles, and Kelly Pace, as plaintiffs have not identified any evidence of an official or individual

act or omission on the part of any of these members that contributed to the deprivation of a

federally protected right.  Plaintiffs make passing reference to certain policies adopted by the Board concerning CVSA tests, but there is no evidence that any member of the Board of Corrections took action concerning plaintiffs' employment, and neither the members of the Board of Corrections nor the Board itself was an employer of plaintiffs.

The Court dismisses certain other claims as well.  In their response to defendants' motion for summary judgment, plaintiffs do not dispute that the ADC is not a "person" subject to a damages suit under § 1983, *see Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989), or that the ADC is immune from a damages suit on their § 1981 claims.  *Singletary v. Missouri Dept. of Corrections*, 423 F.3d 886, 890 (8th Cir. 2005).  That being so, and as suits against state officials in their official capacities are suits against the state, *see Hafer v. Melo*, 502 U.S. 21, 25 (1991), plaintiffs' §§ 1981 and 1983 damages claims against the ADC and Norris and Lay in their official capacities will be dismissed.  Further, plaintiffs' § 1981 claims against Norris and Lay in their individual capacities must be dismissed as a federal action to enforce rights under § 1981 against a state actor may only be brought pursuant to § 1983.  *Artis v. Francis Howell North Band Booster Ass'n, Inc.*, 161 F.3d 1178, 1181 (8th Cir. 1998) (citing *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 735 (1989) (§ 1983 "provides the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor")).  *See also Lockridge v. Board of Trustees of University of Arkansas*, 315 F.3d 1005, 1007 (8th Cir. 2003) (en banc) (stating that claim alleging a violation of § 1981 may not be brought against state actors, including one who was sued in official and individual capacities, but must be brought under § 1983); *Washington v. Brooks*, No. 4:06cv0883 JMM, 2006 WL 3334473 (E.D.Ark. 2006) (finding plaintiffs failed to state a § 1981 claim against state actor in

his individual capacity because a federal action to enforce rights under § 1981 against a state

actor may only be brought pursuant to § 1983).  Accordingly, plaintiffs' § 1981 claims against

Norris and Lay in their individual capacities will be dismissed.  Finally, plaintiffs do not dispute

that Title VII liability only attaches to an "employer," *see, e.g., Bonomolo-Hagen v. Clay

Central-Everly Community Sch. Dist.*, 121 F.3d 446 (8th Cir. 1997) (per curiam); *Bales v. Wal-

Mart Stores, Inc.*, 143 F.3d 1103, 1111 (8th Cir. 1998), and so plaintiffs' Title VII claims against

Norris and Lay, who were not plaintiffs' employers, will be dismissed.


2.

The Court now turns to plaintiffs' claims of race discrimination and Patterson's claim of

gender discrimination.  Because no direct evidence supports plaintiffs' § 1983 and Title VII

discrimination claims, this Court analyzes their claims under the *McDonnell Douglas Corp. v.

Green*, 411 U.S. 792 (1973), burden-shifting framework.  *See Glegg v. Arkansas Department of

Correction*, 496 F.3d 922, 926 (8th Cir. 2007) (discrimination claims asserted pursuant to § 1983

and Title VII are analyzed under the burden-shifting framework set forth in *McDonnell

Douglas*).[2]  To meet their burden of showing a prima facie case of race discrimination, plaintiffs

must show (1) he and she were members of a protected class, (2) he and she were meeting their

employer's legitimate job expectations, (3) he and she suffered an adverse employment action,

and (4) similarly situated employees outside the protected class were treated differently or other

---

[2] Direct evidence is evidence that establishes a specific link between the alleged discriminatory animus and the challenged action, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the employment decision.  *Shaffer v. Potter*, 499 F.3d 900, 904 (8th Cir. 2007) (internal quotation marks and citations omitted).  Direct evidence includes evidence of conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude, where it is sufficient to support an inference that discriminatory attitude more likely than not was a motivating factor.  *Id.*  Plaintiffs have failed to present such direct evidence of race and gender discrimination.

evidence exists that the employer terminated the employee because of race.  *Carpenter v. Con-Way Cent. Express, Inc.*, 481 F.3d 611, 616 (8th Cir. 2007) (internal quotation marks and citation omitted); *Mitchell v. City of Dumas, Ark.*, 187 Fed.Appx. 666, 668-69 (8th Cir. 2006).  To meet her burden of showing a prima facie case of gender discrimination, Patterson must show (1) she was a member of a protected class, (2) she was qualified to perform her job, (3) she suffered an adverse employment action, and (4) she was treated differently than similarly situated males or there is some other evidence that would give rise to an inference of gender discrimination. *Holland v. Sam's Club*, 487 F.3d 641, 644 (8th Cir. 2007); *Turner v. Gonzales*, 421 F.3d 688, 694 (8th Cir. 2005).

        The establishment of a prima facie case creates a presumption of unlawful discrimination, which in turn requires a defendant to come forward with evidence of a legitimate, nondiscriminatory reason for the defendant's actions.  *McGinnis v. Union Pacific Railroad*, 496 F.3d 868, 873 (8th Cir. 2007).  If the defendant articulates such a reason, the burden returns to the plaintiff to show the defendant's proffered reason is pretextual.  *Id.*

        Given that the ADC has proffered legitimate, nondiscriminatory reasons for the adverse employment action taken against plaintiffs, and plaintiffs have presented whatever evidence they have to show that the proffered reasons were a pretext for race and gender discrimination, this Court will assume that plaintiffs have presented a prima facie case of race and gender discrimination with respect to their terminations and will focus on the pretext stage of the *McDonnell Douglas* burden-shifting framework.  *See Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 856 (8th Cir. 2005) (Colloton, J., concurring).

a.

Plaintiffs first attempt to establish pretext for race discrimination by showing that they were treated differently from similarly situated white and male employees.  This requires evidence that plaintiffs and the white and male employees were involved in or accused of the same or similar conduct and were disciplined in different ways.  *Rodgers*, 417 F.3d at 852.[3]

Where a pretext argument is based on comparisons of employees, a plaintiff must show that employees are similarly situated in all relevant aspects.  *Harvey v. Anheuser-Busch, Inc.*, 38 F.3d 968, 972 (8th Cir. 1994).  The test to determine whether employees are "similarly situated" to warrant a comparison to a plaintiff is, as previously noted, a "rigorous" one.  *Id.   See also Rodgers*, 417 F.3d at 853; *Equal Employment Opportunity Commission v. Kohler Co.*, 335 F.3d 766, 775 (8th Cir. 2003).  "'Instances of disparate treatment can support a claim of pretext, but [plaintiff] has the burden of proving that he and the disparately treated [employees] were similarly situated in all relevant respects.'" *Id.* at 775-76 (quoting *Lynn v. Deaconess Medical Ctr.-West Campus*, 160 F.3d 484, 487 (8th Cir. 1998)).  "Specifically, the individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Id.* at 776.  To be probative evidence of pretext, the misconduct of more leniently disciplined employees must be of comparable seriousness.  *Id.  See also Rodgers*, 417 F.3d at 853.

Plaintiffs point to white employee Michael Sullivan ("Sullivan:) as having received

---

[3] For purposes of establishing a prima facie case of disparate treatment, the Eighth Circuit in *Rodgers* adopted a "low-threshold" standard for determining whether employees are similarly situated as the burden of establishing a prima facie case of disparate treatment is not onerous.  417 F.3d at 852-53.  At the pretext stage, however, the test for determining whether employees are similarly situated is a "rigorous" one.  *Id.* at 853.  Hence, this Court's determination, on this record at least, to proceed directly to the pretext stage of the *McDonnell Douglas* burden-shifting framework.  *See Rogers*, 417 F.3d at 856 (Colloton, J., concurring).  *But cf. Fields v. Shelter Mutual Ins. Co.*, — F.3d —, 2008 WL 763017 (8th cir. 2008) (adopting "rigorous" test at prima facie stage).

favorable treatment in relation to a grievance filed against him by an inmate in September 2003. In that case, inmate John Shepperd ("Shepperd") claimed that Sullivan kicked him and the matter was referred to IAD for investigation. Sullivan claimed he never made contact but was jesting with Shepperd. Shepperd, who was not injured, claimed otherwise and there were witness statements supporting both versions. At the time of the investigation, the ADC did not have CVSA examiners and Lay ultimately found the evidence to be inconclusive as to whether Sullivan kicked or struck Shepperd. Plaintiffs and Sullivan were not similarly situated in all relevant respects as Sullivan's alleged kicking of an inmate is not similar to selling drugs to an inmate or having sexual contact with an inmate, and plaintiffs do not dispute that the conduct of which Sullivan was accused permits different levels of discipline, while the conduct of which they were accused is grounds for immediate termination.

Plaintiffs additionally point to white employee John Thompson ("Thompson") as not having been subject to an IAD investigation and CVSA test for certain misconduct. In Thompson's case, there was a tip that he would be bringing tobacco on October 4, 2006. Thompson was searched and found to have a large quantity of tobacco on his person. Thompson was immediately terminated and taken to jail by the Lincoln County Sheriff's Office. In contrast, there is no evidence of a tip that plaintiffs would engage in the misconduct of which they were accused; the alleged misconduct was discovered after the fact. Accordingly, plaintiffs have not demonstrated that they and Thompson were similarly situated in all relevant respects.

Plaintiffs additionally point to white female Officer Susan Lenartowick ("Lenartowick") as having received favorable treatment in that she was not investigated by IAD for certain misconduct. Her circumstances, however, are not similar to that of plaintiffs. In his statement in

which he had accused Patterson of having sex with inmate Davis, Gardner claimed that a "white woman officer" ... "fooled around" with another inmate, and Lay believed that Gardner may have been referring to Lenartowick.  The record shows that the ADC eventually determined through shift rosters that Lenartowick was the "white woman officer" to whom Gardner was referring and, although she was on leave time, efforts were made to get her in for questioning. Before that could take place, the ADC, on March 6, 2006, was contacted by the West Memphis, Arkansas police, who advised that Lenartowick was the driver of a vehicle in which the passenger was an ADC parolee who claimed they had spent the night together in a motel.  Based on this information, Lay immediately terminated Lenartowick's employment the following day. There was no need for further investigation at that time and the circumstances under which Lenartowick was terminated – inappropriate relationship with a parolee – differed from that of plaintiffs.  Accordingly, plaintiffs and Lenartowick were not similarly situated in all relevant respects.

Finally, plaintiffs claim an investigation of Assistant Warden of the Varner Unit, Tim Moncrief ("Moncrief"), was conducted differently in that Moncrief was given a chance to take a polygraph after a CVSA test given by non-ADC examiners indicated he was untruthful. Moncrief, however, arranged for an independent polygraph examination as permitted by ADC policy in effect at the time, and the misconduct of which he was accused – pushing an emergency reset button knowing that it was improperly wired and which thereby opened certain cell doors, allowing several prisoners out of their cells (after which an inmate killed another inmate) – was not alleged misconduct similar to that of plaintiffs.[4]

---

[4] Moreover, an African-American female officer, K.L. Jacobs, was terminated after failing a CVSA test but, like Moncrief, was allowed to obtain an independent polygraph test which indicated truthfulness.  Jacobs was thereafter reinstated.

In sum, plaintiffs have not identified any white and male employees and their circumstances from which one could find that they and the disparately treated employees were similarly situated in all relevant respects, and plaintiffs accordingly have not on that basis demonstrated that ADC's stated reasons for their termination are pretextual.

b.

As further evidence of pretext for race and gender discrimination, plaintiffs dispute that they engaged in the conduct of which they were accused and, in reference to themselves and other African-American employees, claim the investigations were inadequate and the CVSA tests flawed and illegally administered. They claim the ADC examiners, in violation of state law and administrative directives, were not licensed or qualified to administer the CVSA tests and that the IAD investigators cursed and threatened them, causing them to be nervous and upset when they were administered the CVSA tests, and improperly and inadequately conducted the investigations. But even assuming plaintiffs are correct (and in some cases they are), other individuals outside of the protected class have been given CVSA tests by the same individuals that administered the CVSA tests to plaintiffs and plaintiffs have not demonstrated that the CVSA tests at issue in this action were administered inconsistent with the way the ADC administered all CVSA tests at that time. Nor have plaintiffs demonstrated that their investigations were conducted differently from that of other similarly situated white or male employees. In any case, the employment discrimination laws under which plaintiffs bring this action prohibit intentional discrimination based on certain, discrete classifications; they do not prohibit employment decisions based on other facts, such as job performance, erroneous

17

evaluations, personality conflicts, or even unsound business practices. *Rose-Matson v. NME Hosp., Inc.*, 133 F.3d 1104, 1109 (8th Cir. 1998) (citation omitted). *See also Soto v. Core-Mark Intern., Inc.* — F.3d —, 2008 WL 850237, *4 (8th Cir. Apr. 1, 2008) ("In determining whether a plaintiff has produced sufficient evidence of pretext, the key question is not whether the stated basis for termination actually occurred, but whether the defendant believed it to have occurred"); *Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 935 (8th Cir. 2006) (noting that a proffered legitimate, nondiscriminatory reason for termination need not, in the end, be correct if the employer honestly believed the asserted grounds at the time of the termination). A plaintiff must do more than simply discredit an employer's nondiscriminatory explanation; he or she must also present evidence capable of proving that the real reason for his or her termination was discrimination based on race and/or gender. *Nelson v. Boatmen's Bancshares, Inc.*, 26 F.3d 796, 801 (8th Cir. 1994) (internal quotation marks and citation omitted). *Cf. Johnson v. AT&T*, 422 F.3d 756, 762-63 (8th Cir. 2005) (employer's articulated reason for terminating employee, namely that it believed he had called in bomb threats, was not pretext for race discrimination, regardless of whether employer was mistaken in its belief, where nine co-workers identified voice on recording of bomb threat as his, and there was no causal relationship between security manager's alleged racially motivated comments and employee's termination). Here, plaintiffs simply have not presented evidence from which it could reasonably be determined that the ADC terminated them because of race and gender.[5]

---

[5] Moreover, Woods was replaced by an African-American male and Patterson was replaced by an African-American female. Replacement of a plaintiff with an individual who is a member of the same protected class "cuts strongly against any inference of discrimination." *Murray v. Gilmore*, 406 F.3d 708, 715 (D.C. 2005). The Court would note that at the time of plaintiffs' terminations, approximately 74% of the security officers assigned to the Cummins Unit were African-American, with over 53% being African-American females.

3.

Woods also claims he was terminated in retaliation for his testifying on behalf of Davies, his friend and fellow co-worker, who had alleged sexual harassment against Long, Woods' then-supervisor.  This Court uses the *McDonnell Douglas* framework to analyze Woods' retaliation claim.  *Clegg*, 496 F.3d at 928.  In order to establish a prima facie case of retaliation, Woods must produce evidence (1) that he engaged in statutorily protected activity; (2) an adverse employment action was taken against him; and (3) a causal connection exists between the two events.  *Id.*

Concerning the third element, Woods' testimony on behalf of Davies occurred some ten months prior to Norris' decision to uphold Lay's termination of Woods.  The Eighth Circuit generally requires more than a mere temporal connection in order to infer causation, *Recio v. Creighton University*, — F.3d —, 2008 WL 927598, at *6 (8th Cir. Apr. 8, 2008), and the temporal connection here, some ten months, is not close enough to raise an inference of causation.  *Weger v. City of Ladue*, 500 F.3d 710, 727 (8th Cir. 2007) (noting that, though not dispositive, the Eighth Circuit has previously held that an interval as brief as two months did not show causation for purposes of establishing a retaliation claim, and that a two-week interval was sufficient, but barely so) (internal quotation and citation omitted).  That being so, and as Woods has failed to provide any additional evidence of a causal link between his testifying on behalf of Davies and his termination, defendants are entitled to summary judgment on Woods' retaliation claim.

4.

19

Plaintiffs next claim that undergoing an unlawful CVSA test which indicated untruthfulness, thereby costing them their jobs and damaging their reputations, as well as the continuous discharge of other African-American employees, created a hostile work environment. A hostile work environment is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the terms of the victim's employment and create an abusive working environment as viewed objectively by a reasonable person. *Carpenter*, 481 F.3d at 618 (internal quotation marks and citation omitted). To be actionable, the conduct complained of must be extreme in nature and not merely rude or unpleasant. *Id*. Allegations of a few isolated or sporadic incidents will not suffice; rather, the plaintiff must demonstrate the alleged harassment was so intimidating, offensive, or hostile that it poisoned the work environment. *Id*.

Not all unpleasant conduct creates a hostile work environment. *Williams v. City of Kansas City, Missouri*, 223 F.3d 749, 753 (8th Cir. 2000). Rather, the plaintiff must show that he or she was singled out because of race or gender and that the conduct was severe and pervasive. *Id.*; *Hathaway v. Runyon*, 132 F.3d 1214, 1221 (8th Cir. 1997). Plaintiffs have failed to show that they were singled out for treatment on the basis of their membership in a protected category and defendants accordingly are entitled to summary judgment on plaintiffs' claim of a hostile work environment.

5.

Plaintiffs next claim that the dissimilar treatment of African-American employees accused of misconduct compared to white employees violated their equal protection rights. The

initial inquiry in any equal protection claim is whether the plaintiff has established that he or she was treated differently than others who are similarly situated to him or her. *Keevan v. Smith*, 100 F.3d 644, 648 (8th Cir. 1996) (citations omitted). Absent a threshold showing that a plaintiff is similarly situated to those who allegedly receive favorable treatment, the plaintiff does not have a viable equal protection claim. *Id*. (internal quotation marks and citation omitted). For the reasons stated previously, plaintiffs have not identified any white and male employees and their circumstances from which one could find that they and the disparately treated employees were similarly situated.

6.

Plaintiffs next claim that the manner in which their IAD investigations were conducted, including raised voices and improper CVSA tests, violated their rights to substantive due process. This Court has considered the manner in which the IAD investigations of plaintiffs were conducted and does not find these investigations were truly irrational or conscience shocking so as to support a claim of substantive due process. *Booker v. City of St. Louis*, 309 F.3d 464, 468 (8th Cir. 2002).

7.

Plaintiffs next claim that they were deprived of a protected liberty interest because the faulty manner in which the CVSA tests were administered and the false results were used to terminate them and stigmatize them in the community. A government employee is entitled to procedural due process in connection with being discharged from employment only when he or

she has been deprived of a constitutionally protected property or liberty interest.  *Stodghill v.*

*Wellston School Dist.*, 512 F.3d 472, 476 (8th Cir. 2008) (internal quotation marks and citation

omitted).  To establish protected liberty interests, plaintiffs are required to establish that a

government official, in connection with discharging plaintiffs, publically made untrue charges

against them that would stigmatize them so as to seriously damage their standing and

associations in their community, or foreclose their freedom to take advantage of other

employment opportunities.  *Id.*  Plaintiffs do not discuss this issue in detail, but this Court in any

case determines that they have not established that any untrue charges against them were

publically made in the course of their discharge.[6]


8.

Finally, concerning plaintiffs' state law defamation claims, the Eighth Circuit has held

that when federal and state claims are joined and the federal claims are dismissed on a motion for

summary judgment, the supplemental state claims are ordinarily dismissed without prejudice to

avoid needless decisions of state law as a matter of comity.  *American Civil Liberties Union v.*

*City of Florissant*, 186 F.3d 1095, 1098-99 (8th Cir. 1999) (quoting *Birchem v. Knights of*

*Columbus*, 116 F.3d 310, 314 (8th Cir. 1997)).  *See also Figg v. Russell*, 433 F.3d 593, 600 (8th

Cir. 2006) (noting that when court dismissed federal § 1983 action, it should have exercised its

discretion to dismiss state-law claims without prejudice, leaving it to plaintiff to determine

whether to reassert them in state court); *Johnson v City of Shorewood, Minn.*, 360 F.3d 810, 819

(8th Cir. 2004) (district court has discretion to decline supplemental jurisdiction where it has

---

[6] Patterson's termination was later reversed by SEGAP because of a lack of corroborating evidence, but Patterson has not established that any untrue statements were made in the course of her discharge.

dismissed all original jurisdiction claims).  Accordingly, plaintiffs' state law defamation claims will be dismissed without prejudice.

III.

For the foregoing reasons, the Court grants defendants' motion for summary judgment on plaintiffs' federal claims and dismisses plaintiffs' state law defamation claims without prejudice. Judgment will be entered accordingly.[7]

IT IS SO ORDERED this 8th day of May 2008.

/s/Susan Webber Wright

UNITED STATES DISTRICT JUDGE

---

[7] Defendants' renewed motion for separate trials [doc.#52] is denied as moot.